# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTOINETTE KEATON,<br>    Plaintiff,<br><br>    v.<br><br>STATE OF CONNECTICUT DEPARTMENT OF<br>REHABILITATION SERVICES<br>    Defendants. | No. 3:16-CV-1810 (MPS) |

## RULING ON THE DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Plaintiff Antoinette H. Keaton filed this action against Defendant, the State of Connecticut Department of Rehabilitation Services ("DORS"), after she was denied a promotion to the position of Senior Vocational Rehabilitation Counselor. Invoking Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendant moves to dismiss the Second Amended Complaint, which sets forth claims for discriminatory failure to promote, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII") (Counts One through Three); and deprivation of Keaton's rights under 42 U.S.C. § 1981 (Count Four). (ECF No. 50.) Keaton seeks compensatory and punitive damages, and an order placing Keaton in the position of Senior Vocational Rehabilitation Counselor, among other relief.

For the reasons discussed below, I DENY the motion to dismiss as to Keaton's failure-to-promote and retaliation claims (Counts One and Two). I GRANT the motion to dismiss as to Keaton's hostile work environment and Section 1981 claims (Counts Three and Four), and as to Keaton's claim for punitive damages.

## I.    Factual Allegations

### A.  Keaton's Employment at DORS

Keaton, an African-American woman, has worked for the State of Connecticut for more than 23 years. (ECF No. 50 ¶ 2.) She began working for DORS, a state agency charged with maximizing opportunities for people with disabilities to live, learn, and work independently, in 2009, and has worked for that agency for eight years. (*Id*. ¶¶ 2-3, 9.)

**B. DORS Denies Keaton's Request for a Promotion to the Position of Senior Vocational Rehabilitation Counselor**

In 2011, Keaton applied for and was denied a promotion to the position of Senior Vocational Rehabilitation Counselor. (*Id*. ¶ 5.) On January 7, 2013, in a letter to her supervisor, David Johnson, Keaton again requested that she be considered for a promotion to that position. (*Id*.) Keaton met all of the requirements "of the job description and the position posting": she had previously worked for two and a half years as a senior vocational rehabilitation counselor with another Connecticut agency, Disability Determination Services; she had a Master's degree "from an accredited college"; she had at least four years of experience as a vocational rehabilitation counselor, at least one of which was spent with DORS; and she earned excellent evaluations while serving as a vocational rehabilitation counselor. (*Id*. ¶ 6.)

Lynn Frith, DORS's Northern Region District Director, denied Keaton's request for the promotion in a memo dated June 24, 2013, but which Keaton received on August 1, 2013. (*Id*. ¶ 7.)

**C. DORS Promotes Two White Women to the Position of Senior Vocational Rehabilitation Counselor**

DORS promoted to the "Senior Vocational Rehabilitation Counselor position sought by the Plaintiff" two white women, Allison Kopie and Alicia Kucharczyk, who Keaton alleges were less qualified for the position than she was. (*Id*. ¶ 8.) Keaton was as or more senior and had greater relevant work experience than either Kopie or Kucharczyk. (*Id*. ¶ 9.)

David Johnson supervised Kopie, Kucharczyk, and Keaton, but recommended only Kopie and Kucharczyk for the promotion. (*Id*. ¶ 10.) While Johnson offered to and did assist Kopie for a year with preparing her cases for review in connection with her candidacy for the promotion, Johnson never offered assistance to Keaton, leaving her disadvantaged in the promotion process. (*Id*. ¶ 13.) Johnson also permitted Kopie to "complete a summary of her caseload review in connection with her effort to be promoted but denied" Keaton the same opportunity. (*Id*. ¶ 14.) Kopie was promoted on August 1, 2013, the same day Keaton received the notice she was not promoted. (*Id*. ¶ 16.)

DORS cited four "eligibility determination errors" Keaton made as grounds for the denial of her request for promotion. (*Id*. ¶ 17.) Keaton alleges that these errors were subsequently determined to be the result of a DORS computer system defect "and were approved by" her supervisor, Johnson. She also alleges that other employees "routinely" committed these errors. (*Id*. ¶ 17.) Keaton alleges that while white employees made errors, those employees' errors did not prevent them from being promoted. (*Id*. ¶ 18.) For example, Kopie erroneously authorized the purchase of a prosthesis for an individual before that individual was determined to be eligible for DORS's services. (*Id*. ¶ 19.) Johnson erroneously closed multiple cases prematurely. (*Id*. ¶ 20.) Keaton alleges that these errors were more serious than her own, but did not prevent Kopie or Johnson from being promoted. (*Id*. ¶¶ 19-20.)

### D. Minority Employees and Clients Experience Negative Treatment at DORS

Keaton alleges that Johnson has never recommended any black person for a promotion to the position of Senior Vocational Rehabilitation Counselor. (*Id*. ¶ 10.) Keaton "and many of her co-workers feel that David Johnson possesses a negative animus toward African Americans and Latinos." (*Id*. ¶ 11.) In support of this allegation, Keaton alleges that she and her co-worker

Latarsha Johnson heard David Johnson refer to a black male DORS client as "scum." (*Id*. ¶ 11.) Keaton also alleges that David Johnson, in the course of his work for DORS, "routinely attempted to deny eligibility to African American consumers for even the most minimal services, such as short term transportation, clothing and other resources to assist such consumers in obtaining employment." (*Id*. ¶ 12.)

Furthermore, a survey of DORS employees conducted at an annual meeting, which Keaton participated in, revealed that DORS's "minority employees believe that [DORS] promotes very few, if any, minority employees," and "revealed the perception that [DORS] . . . treat[s] people of color unfairly." (*Id*. ¶¶ 15, 29.) DORS's most recent promotions were of three white women, Kucharczyk, Kopie, and Maureen Furey, and a white man, Johnson. (*Id*. ¶ 16.)

### E. Keaton Challenges DORS's Promotion Decision and Criticizes DORS's Treatment of Minority Employees and Clients

After she learned that DORS denied her request to be promoted to the Senior Vocational Rehabilitation Counselor position, Keaton filed a grievance challenging the decision. (*Id*. ¶ 26.) Keaton alleges that "the substance of this grievance was that she was not promoted while a white female co-worker with less seniority and less experience was promoted." (*Id*. ¶ 27.) DORS attaches to its motion to dismiss a grievance that a union representative filed on behalf of Keaton. The entire "Statement of Grievance" reads: "Bargaining unit sought promotion. Employer denied the promotion in violation of the Contract. Employer otherwise violated the Contract." (ECF No. 54-3 at 1.) The grievance DORS submits does not mention that Keaton's white, female co-worker was promoted while she was not, and includes no allegations that Keaton was not promoted for discriminatory reasons. Keaton stated in her amended CHRO complaint that she "did not mention discrimination" in her union grievance "because [she] was unsure of the reason for the denial of

[the] promotion" at the time (ECF No. 54-2 at 6.) Keaton reiterated in her opposition brief that she did not use "the word 'discrimination'" in the grievance. (ECF No. 57 at 11)

"[S]ubsequent to not being promoted and prior to November 14, 2013," Keaton "joined with other co-workers in openly expressing doubt that people of color within the DORS had a fair and equal opportunity for advancement within the department." (*Id.* ¶ 27.) Keaton "openly complained" that she, the only black person under Johnson's supervision, was not promoted, while three white women were. (*Id.* ¶ 28.)

Keaton also confronted Johnson "on a number of occasions . . . concerning his disparaging description of a Black client as well as his habit of attempting to deny services to prospective clients based on the prospective client's race rather than the prospective client's disability and need for services." (*Id.* ¶ 30.)

Keaton alleges that DORS was aware of her comments about DORS's discriminatory treatment of her, other employees, and "clients and prospective clients" of color. (*Id.* ¶ 31.) DORS was also aware of her grievance, as DORS is typically notified of grievances when they are filed. (*Id.* ¶ 32.)

### F. Keaton Receives a Negative Performance Evaluation and Experiences Additional Scrutiny at Work

On November 14, 2013, Johnson approached Keaton with his written performance evaluation of her and "insisted that she sign it immediately." (*Id.* ¶ 33.) In response, Keaton indicated to Johnson that she wanted the opportunity to read and review the evaluation before signing it. (*Id.* ¶ 34.) Johnson "threatened" to report Keaton's refusal to sign the evaluation to Frith if she did not sign immediately. (*Id.* ¶ 35.)

Keaton reviewed the evaluation and discovered that Johnson rated her performance as "unsatisfactory" and awarded her 20 supervisor discretionary points, despite awarding her 31

supervisor discretionary points and rating her as "excellent" in all five of the categories assessed in her previous evaluation. (*Id*. ¶¶ 36-37.) Keaton alleges that she exhibited no change in work performance, that she had not received any complaints, criticism, or warnings, and had not been placed on a performance improvement plan or corrective action plan in the year preceding the November 2013 evaluation. (*Id*. ¶ 38.) The November 2013 evaluation was Johnson's first opportunity to evaluate Keaton's work after she filed her grievance and openly criticized DORS. (*Id*. ¶ 40.)

Also on November 14, 2013, "[a]mong other dates and times," Keaton reported "harassment" to Frith, who did nothing. (*Id*. ¶ 93.)

From July 5, 2014 onward, Keaton was the only employee in her office who did not have an onsite supervisor. (*Id*. ¶ 41.) While she was away from her office, Johnson "demanded keys to her file cabinet on the pretense that he may have to access her files while she was away." (*Id*. ¶ 44.) From June 25, 2014 to July 7, 2014, Keaton was the only person in her office who could not access her computer, causing her to be concerned that her year-end statistics would be affected. (*Id*. ¶ 42.) Keaton later learned from Information Technology personnel that "someone had done something to her computer." (*Id*. ¶ 43.) Keaton alleges that she was ostracized by management after she filed her grievance. (*Id*. ¶ 45.)

### G. Administrative Complaints and this Lawsuit

Keaton filed administrative complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") and received notice of her right to file a lawsuit from both agencies.[1] Keaton filed this

---

[1] Although Keaton does not attach the right-to-sue letters to the Second Amended Complaint, she did attach them to the Amended Complaint (ECF No. 29-1 and 29-2). Keaton also states in her opposition to the motion to dismiss that her original CHRO/EEOC charge and her amended

lawsuit in Connecticut Superior Court, after which DORS removed the case to this Court. (ECF No. 1.)

## II.    Legal Standards

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court must dismiss an action when it "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). In deciding a Rule 12(b)(1) motion, "the court may also rely on evidence outside the complaint." *Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015).

Under Rule 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts all of the complaint's factual allegations as true when evaluating a motion to dismiss. *Id.* at 572. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). "When a complaint is based solely

---

CHRO/EEOC charge both have been "incorporated by reference" into the operative complaint. (ECF No. 57 at 22.) The CHRO complaint, which Defendant attaches to its motion to dismiss, indicates that it was filed on April 14, 2014 and that Keaton amended her charge on April 22, 2014. (ECF No. 54-2.)

on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant [a] defendant[']s motion to dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Iqbal*, 556 U.S. at 680).

In deciding a Rule 12(b)(6) motion, courts may consider documents attached to, integral to, or incorporated by reference in the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted).

## III. Discussion

### A. Discrimination in Violation of Section 1981

The Court lacks jurisdiction over Keaton's claim that DORS discriminated against her in violation of 42 U.S.C. § 1981. That statute affords "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

Keaton appears to concede that her Section 1981 claim against DORS, an arm of the State of Connecticut, is barred by the Eleventh Amendment. (ECF No. 57 at 4-5.) "Stated as simply as possible, the Eleventh Amendment means that, as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its

authority under Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009).

Courts in the Second Circuit have held that the Eleventh Amendment precludes Section 1981 claims against a State agency. *See Wang v. Office of Prof'l. Med. Conduct, N.Y.*, 354 F. App'x 459, 460 (2d Cir. 2009); *Allah v. City of New York*, No. 15-CV-6842 (CBA)(LB), 2016 WL 676394, at *3 (E.D.N.Y. Feb. 17, 2016) ("Congress has not abrogated sovereign immunity from claims brought under 42 U.S.C. § . . . 1981. . . ). Further, "the State of Connecticut has not waived its sovereign immunity" under Section 1981. *Coger v. Connecticut*, 309 F. Supp. 2d 274, 281 (D. Conn. 2004). This immunity extends to Keaton's claim for a prospective injunction. *See, e.g.*, *Rodriguez v. Fed. Bureau of Investigation*, No. 16-CV-6655 (ENV) (LB), 2017 WL 3917156, at *2 (E.D.N.Y. Sept. 6, 2017) ("[A]ny possible claim for a prospective injunction would need to be dismissed due to [plaintiff's] failure to follow the requirement, established in *Ex Parte Young*, . . . that a plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly.") (internal quotation marks omitted); *Coger*, 309 F. Supp. 2d at 281 ("This Eleventh Amendment bar exists whether the relief sought is legal or equitable.").

Because the Eleventh Amendment precludes a Section 1981 suit against DORS, the Court does not have jurisdiction over Keaton's Section 1981 claim. I grant DORS's motion to dismiss Keaton's Section 1981 claim (Count Four) under Rule 12(b)(1).

### B.  Failure to Promote in Violation of Title VII

Defendant argues that Keaton fails to allege facts to support a plausible failure-to-promote claim under Title VII. I disagree.

To state a claim for discriminatory failure to promote under Title VII, a plaintiff must plausibly allege that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004) (internal quotation marks omitted). "In all cases . . . there must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination." *Aulicino v. New York City Dep't. of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (internal quotation marks omitted). To survive a motion to dismiss, "the facts pled need only give 'plausible support to a minimal inference of discriminatory motivation.'" *Sellers v. First Student, Inc.*, No. 16-CV-236 (JCH), 2016 WL 6440111, at *4 (D. Conn. Oct. 28, 2016) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015)).

The second element, that the plaintiff applied and was qualified for a job for which the employer was seeking applicants, "cannot be established merely with evidence that a plaintiff generally requested promotion consideration. A specific application is required to ensure that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." *Petrosino*, 385 F.3d at 227 (internal quotation marks and alterations omitted) (rejecting plaintiff-appellant's argument that she adequately applied for a management position "by telling her managers that she wanted to be a manager").

Defendant does not dispute that Keaton, an African-American woman, is a member of a protected class for the purpose of her Title VII claim. As to the remaining elements, Keaton alleges that she "requested consideration for a promotion to the position of Senior Vocational Rehabilitation Counselor" with DORS by sending "a letter to her supervisor, Mr. David Johnson."

(ECF No. 50 ¶ 5.) She also alleges that the position was "post[ed]" (*Id*. ¶ 6) and that Kopie, a white woman, was promoted to the position on the same day Keaton received the letter from Frith—dated over a month earlier—notifying her that she did not receive the position. (*Id*. ¶ 16.) Drawing all inferences in her favor, I find that Keaton sufficiently pleads that she applied to a vacant position for which DORS was seeking applicants and that DORS filled the vacant position with a person outside of her protected class.

Keaton also sufficiently alleges that the denial of her promotion occurred under circumstances giving rise to an inference of race discrimination. "One way of raising an inference of discrimination is through a showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside her protected group." *Stinnett v. Delta Air Lines, Inc.*, ---F. Supp. 3d ---, 2017 WL 4443520, at *7 (E.D.N.Y. Sept. 30, 2017) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (internal quotation marks omitted). A plaintiff may also "creat[e] a 'mosaic' of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

Keaton alleges that Kopie, a white woman with less experience and less than or the same level of seniority as her, was promoted to the position of Senior Vocational Rehabilitation Counselor. (ECF No. 50 ¶¶ 8-9.) She also alleges that Johnson never recommended any black person for promotion to that position, and that DORS's last four promotions were of white employees, despite the fact that two of those employees, Johnson and Kopie, made errors at work, and despite the fact that DORS attributed Keaton's failure to be promoted to errors she made at work. (*Id*. ¶¶ 10, 17-18.) These allegations "give plausible support to a minimal inference of discriminatory motivation," *Vega*, 801 F.3d at 84, that is, that Keaton was treated less favorably

than her similarly situated white co-workers because of her race. I therefore DENY DORS's

motion to dismiss Keaton's failure-to-promote claim (Count One).

## C. Retaliation in Violation of Title VII

Defendant also moves to dismiss Keaton's claim that Defendant retaliated against her for

criticizing DORS's treatment of people of color. To state a claim for retaliation under Title VII,[2]

a plaintiff must plausibly allege that "(1) defendants discriminated—or took an adverse

employment action—against [her], (2) 'because' [she] has opposed any unlawful employment

practice." *Id.* at 90. "Title VII retaliation claims must be proved according to traditional principles

of but-for causation . . . ." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

### 1. Protected Activity

Under Title VII, protected activity includes both "opposing discrimination proscribed by

the statute and . . . participating in Title VII proceedings." *Jute v. Hamilton Sundstrand Corp.*, 420

F.3d 166, 173 (2d Cir. 2005).

The opposition clause of Title VII "makes it unlawful for an employer to retaliate against

an individual because [he] 'opposed any practice' made unlawful by Title VII . . . ." *Littlejohn*,

795 F.3d at 316 (quoting 42 U.S.C. § 2000e-3(a)). The Supreme Court clarified in *Crawford v.*

*Metropolitan Government of Nashville & Davidson County* "that any activity designed 'to resist

or antagonize . . . ; to contend against; to confront; resist; [or] withstand' discrimination prohibited

by Title VII constitutes a protected oppositional activity." *Littlejohn*, 795 F.3d at 317 (quoting

*Crawford*, 555 U.S. 271, 276 (2009)). "[I]f an employee . . . actively 'support[s]' other employees

---

[2] The anti-retaliation provision of Title VII states, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause." *Id*. at 318 (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). The participation clause "makes it unlawful to retaliate against an individual because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Id*. at 316.

Keaton does not allege, and does not argue, that she participated in an investigation, proceeding, or hearing under Title VII that could be protected activity under the participation clause. At issue is whether she engaged in protected activity under the opposition clause.

I find that Keaton has plausibly alleged that she engaged in protected activity by criticizing DORS's promotion practices with respect to minority employees and "openly complain[ing]" that Johnson had promoted three white women instead of her, an African-American woman. (ECF No. 50 ¶ 28.) Defendant argues that Keaton "does not allege that she made a formal or informal complaint to management regarding discrimination, and generally expressing displeasure or doubt about advancement opportunities is not protected activity under Title VII." (ECF No. 54-1 at 25.) Defendant principally relies on *Cooper v. N.Y. State Dep't of Labor*, 819 F.3d 678 (2d Cir. 2016), in which the Second Circuit affirmed the dismissal of a Title VII retaliation claim where the plaintiff alleged that she engaged in protected activity when she complained about changes in the department's complaint handling procedure and said they would "increase the likelihood of future unredressed Title VII violations." *Cooper*, 819 F.3d at 681. The Court held that the plaintiff did not have a good faith belief that changing the department's complaint handling procedures would qualify as an unlawful employment practice under Title VII. *Id*. at 681.

Unlike the plaintiff in *Cooper*, however, Keaton does not allege merely that she complained about potential, future discrimination against minority employees. Rather, construing Keaton's allegations in the light most favorable to her, Keaton's allegations that she "openly express[ed] doubt that people of color within the DORS had a fair and equal opportunity for advancement" and "openly complained . . . that while three white females were successful in their efforts to become promoted, she was not" (ECF No. 50 ¶¶ 27-28), suggest that Keaton protested unlawful employment activity that had already occurred. This conduct constitutes protected activity under Title VII. *See Littlejohn*, 795 F.3d at 317 ("§ 704(a)'s opposition clause protects [formal] as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges") (quoting *Sumner*, 899 F.2d at 209)). [3]

## 2. Adverse Employment Action

Keaton argues that Defendant subjected her to an adverse employment action when Johnson gave her a negative performance evaluation despite no change in her performance from the previous year, "attempted to compel her to sign" the evaluation without giving her an opportunity to review it, and threatened to report her to Frith for refusing to sign the evaluation. (ECF No. 50 ¶¶ 33-38.) Keaton also alleges that from July 5, 2014 onward, she was the only employee in her office without an onsite supervisor (ECF No. 50 ¶ 41), and that from June 25, 2014 to July 7, 2014, she was the only person in her office without access to her computer, and

---

[3] Because I find that Keaton plausibly alleges that she engaged in protected activity by criticizing DORS's promotion practices, I need not consider whether her union grievance, participation in a DORS survey about treatment of minority employees, confrontation of Johnson regarding his disparagement of a black client, and filing of an administrative complaint also constitute protected activity.

later learned from IT personnel that "someone had done something to her computer . . . ." (ECF No. 50 ¶ 43.) She also alleges that Johnson "demanded keys to her file cabinet" while she was away, causing Keaton to be concerned that "her work would be sabotaged . . . ." (ECF No. 50 ¶ 44.) Finally, Keaton alleges that she was "ostracized by management." (ECF No. 50 ¶ 45.)

Title VII's anti-retaliation provision covers only an employer's actions that are "materially adverse." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60 (2006). In the context of Title VII retaliation claims, "[m]aterially adverse" actions are those that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: The antiretaliation provision, unlike the substantive discrimination provision, is not limited to discriminatory actions that affect the terms of conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citing *Burlington*, 548 U.S. at 64) (internal quotation marks and alterations omitted). Nonetheless, "[a]ctions that are 'trivial harms'—i.e., those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011). "Material adversity is to be determined objectively, based on the reactions of a reasonable employee. Context matters, as some actions may take on more or less significance depending on the context." *Id.* (internal citations and quotation marks omitted).

The Second Circuit held in *Vega* that the plaintiff-appellant adequately pleaded a Title VII retaliation claim based on his negative performance review. *Vega*, 801 F.3d at 92. The Court noted that, "of course, a poor performance evaluation could very well deter a reasonable worker from complaining." *Id.*

Keaton alleges that after engaging in protected activity, she received a performance evaluation in which "Johnson had rated her performance as unsatisfactory by awarding her only 20 supervisor discretionary points," despite awarding her "31 supervisor discretionary points" in her previous evaluation, and despite there having been no change in her performance from the previous year. (ECF No. 50 ¶¶ 37-38.) Although she concedes that DORS ultimately corrected the review, increasing her supervisor discretionary score to 26 points, this was still a substantial drop from the previous year. (ECF No. 57 at 16.)[4] Drawing all reasonable inferences in her favor, however, I find that Keaton has alleged that receiving an "unsatisfactory" performance evaluation with an allegedly substantial decrease in her award of "supervisor discretionary points" could "dissuade[] a reasonable worker from making or supporting a charge of discrimination," *Burlington*, 548 U.S. at 68, and therefore constitutes an adverse employment action.[5]

### 3. Causation

Finally, Keaton has adequately alleged causation for the purpose of her retaliation claim. In order to state a claim for retaliation, Keaton must plausibly plead "a connection between the act and [her] engagement in protected activity." *Vega*, 801 F.3d at 90. Keaton must allege that the

---

[4] Defendant argues that DORS "immediately corrected" Keaton's performance evaluation by increasing her award of supervisor discretionary points from 20 to 26, and attaches the apparently corrected evaluation. (ECF No. 54-1 at 28; ECF No. 54-2 at 9.) Keaton does not dispute this, but responds that "[i]ncreasing the award of points from 20 to 26 is no remedy, [as] 26 is still an unfavorable rating." (ECF No. 57 at 16.) It may be that, once the evidence in this case is developed, it will be evident that an award of 26 supervisor discretionary points—down from a previous award of 30 points—does not constitute a materially adverse employment action. But that is not a judgment the Court can make at the pleadings stage.

[5] I need not consider whether Johnson's alleged threat to report Keaton to Frith for refusing to sign her performance evaluation, Johnson's request for keys to Keaton's file cabinet while she was away, and Keaton's being left without a supervisor in the office, possible tampering with her computer, and generally being "ostracized by management" were materially adverse employment actions.

retaliation was the "but-for" cause of the adverse action—that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 90-91 (internal quotation marks omitted).

Keaton alleges that she learned that her request for a promotion was denied on August 1, 2013, and criticized DORS's promotion practices at some point before November 14, 2013, when she received a negative performance evaluation. (ECF No. 50 ¶¶ 7, 27.) She also alleges that the November 2013 evaluation "was Johnson's first opportunity to assess and evaluate [her] immediately subsequent to [Keaton's] grievance and her outspoken criticism of the Defendant's practices," and that she was given an "unfavorable evaluation" despite there having been "no significant change in her performance from the previous year." (*Id.* ¶¶ 38, 40.)

"While the Second Circuit has articulated no 'bright line' rule for when an alleged retaliatory action occurs too far in time from the exercise of a federal right to be considered causally connected, it is well settled that when 'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together." *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) (internal quotation marks and citations omitted). Though Keaton does not specifically allege when she criticized DORS's promotion practices, and though a period of up to three and a half months between the alleged protected activity and adverse action is not "very close," Keaton's allegation that her November 2013 performance evaluation was the first opportunity that Johnson had to assess her work after she openly criticized DORS's promotion practices (ECF No. 50 ¶ 40) is sufficient to plead a connection, especially because I must draw all reasonable inferences in her favor at this stage. *See Vega*, 801 F.3d at 92 (holding that plaintiff plausibly alleged a temporal proximity between protected activity and allegedly retaliatory actions, and therefore causation for the purpose of a

Title VII retaliation claim, where plaintiff alleged two-to-three month duration between protected activity and adverse employment action).

Because Keaton adequately alleges that she suffered a material adverse employment action as a result of her open criticism of DORS's promotion practices, I DENY the motion to dismiss Keaton's retaliation claim (Count Two).[6]

### D. Hostile Work Environment in Violation of Title VII

Keaton also claims that she faced a hostile work environment while employed at DORS. "To state a claim for hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive— that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

---

[6] Defendant argues that Keaton failed to administratively exhaust several of her allegations by failing to include them in her amended administrative charge, which Defendant attaches at ECF No. 54-2. "[T]he failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018). "[C]laims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency." *Shah v. New York State Dep't of Civil Serv.*, 168 F.3d 610, 613 (2d Cir. 1999). Keaton's amended administrative charge includes claims that she was denied a promotion for discriminatory reasons, retaliated against for opposing discrimination by receiving a negative performance evaluation, and subjected to a hostile work environment, including by being criticized at work. (ECF No. 54-2 at 6-8.) Drawing all reasonable inferences in favor of Keaton as required at this stage, I conclude that the allegations in the Second Amended Complaint are reasonably related to the claims included in her amended administrative charge for the purpose of deciding the motion to dismiss. *See Gupta v. City of Bridgeport*, No. 3:14CV00112 (MPS), 2015 WL 1275835, at *6-8 (D. Conn. Mar. 19, 2015) (holding that plaintiff's allegations were reasonably related to those included in her EEOC charge).

As a general rule, alleged incidents supporting a hostile work environment claim must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal citations and quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id*. But it is "well-settled in [the Second] Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id*. "[T]he test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employer *altered for the worse*.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (emphasis in original)).

Among the factors courts consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Whether the challenged conduct is sufficiently severe or pervasive depends on the totality of the circumstances." *Aulicino*, 580 F.3d at 82 (internal citations and quotation marks omitted).

Keaton's allegations are insufficient to state a hostile work environment claim under Title VII. In support of her hostile work environment claim, Keaton reiterates the factual allegations that supported her failure-to-promote and retaliation claims, and then adds that DORS subjected her "to harassment in the form of unwelcome verbal or physical conduct" in the following ways:

> 1) by giving her an unwarranted, lower service rating; 2) by exercising subjective discretion in a manner extremely adverse to the plaintiff; 3) by not affording the plaintiff an opportunity for summary case load review prior to acting upon her request for promotion; 4) by attempting to intimidate the plaintiff into signing a

> performance evaluation without the opportunity to review it and otherwise acting in a manner contrary to her best interests[;] 5) by withdrawing support; 6) by not providing direct supervision; 7) by subjecting the plaintiff's work to heightened scrutiny; 8) by [denying her] promotional opportunities; and[] 9) [by] undermining, sabotaging and otherwise discrediting the plaintiff's work, all thereby contributing to a hostile work environment, making it more difficult for the plaintiff to effectively perform the responsibilities of her job.

(ECF No. 50 ¶ 91.) Some of these allegations are simply conclusory in that they are unsupported by any factual elaboration in the complaint. For example, there are no facts in the complaint specifying the alleged "subjective discretion" or "heightened scrutiny" or "discrediting" of the plaintiff's work. The remaining allegations, even when amplified by the facts set forth in the complaint, simply do not add up to a hostile work environment claim. Keaton's assertions that she was denied a promotion and given a negative performance review allege "discrete discriminatory acts rather than repeated and pervasive conduct" as required to support a hostile work environment claim. *See, e.g.*, *Guy v. MTA New York City Transit*, No. 15-CV-2017 (LDH) (LB), 2016 WL 8711080, at *8 (E.D.N.Y. Sept. 23, 2016) (plaintiff's allegations that he was demoted, suspended, and denied a promotion were insufficient to state a hostile work environment claim).

More generally, none of these allegations support a claim that Keaton endured treatment that was "so severe or pervasive as to have altered the conditions of [Keaton's] environment." *Littlejohn*, 795 F.3d at 321 (affirming dismissal of hostile work environment claim where employer made negative statements about the plaintiff, used harsh tones and sarcasm with plaintiff, distanced herself and declined to meet with plaintiff, wrongfully reprimanded plaintiff, and required plaintiff to recreate work). *See also Fleming v. MaxMara USA, Inc.*, 371 Fed. Appx. 115, 119 (2d Cir. 2010) (summary order) (affirming dismissal of hostile work environment claim where defendants excluded plaintiff from meetings, excessively criticized her work, refused to answer her work-related questions, imposed additional duties on her, threw books at, and sent rude emails to her);

*Williams v. N.Y. State Unified Court Sys. Office of Court Admin.*, 16-CV-2061 (VSB), 2017 WL 4402562, at *7 (S.D.N.Y. Sept. 30, 2017) (dismissing hostile work environment claim where plaintiff alleged that he was reprimanded, unjustly subjected to poor performance reviews, and given additional duties above and beyond his regular assignments). I therefore GRANT the motion to dismiss Keaton's harassment claim (Count Three).[7]

### E. Punitive Damages

Finally, Keaton concedes that she cannot recover punitive damages against the State of Connecticut under Title VII. (ECF No. 57 at 5-6.) *See, e.g.*, *Ettinger v. State Univ. of New York State Coll. of Optometry*, No. 95 Civ. 9893 (RWS), 1998 WL 91089, at *7 (S.D.N.Y. Mar. 2, 1998) (dismissing claim for punitive damages against governmental entity under 42 U.S.C. § 1981a(b)(1)). Therefore, Keaton's claim for punitive damages is dismissed.

### F. Potential Sanctions

Defendant argues that the Court should not consider Keaton's Second Amended Complaint at all, as it was filed one day after the court-ordered deadline, and as the Court had previously warned Keaton that the Court would not allow further amendments in the event she continued to miss court-ordered deadlines.  (ECF No. 54-1 at 5-6, 9-12.) Keaton's Second Amended Complaint was in fact untimely filed, and there was no ambiguity in the Court's order requiring Keaton to file any second amended complaint within fourteen days of May 16, 2017, i.e., no later than May 30,

---

[7] Keaton does not cite any authority to support a hostile work environment claim based on the facts she alleges – rather, she requests leave to amend the complaint. (ECF No. 57 at 21.) She does not explain, however, what allegations she would add if she had the opportunity to amend. She also does not explain why "justice . . . requires" that the Court grant Keaton leave to file a third amended complaint, Fed. R. Civ. P. 15(a), given that the Court warned that she would have no further opportunities to amend her complaint; that, as Defendant points out, she has failed to comply with court-ordered deadlines no fewer than five times in this case; and that another opportunity to amend would only create further delay and impose further expense on the Defendant.

2017. (ECF No. 49.) The Court appreciates that defense counsel has had to draft and file several iterations of a motion to dismiss because of Keaton's failure to comply with court-ordered deadlines regarding amendments to the complaint, and that this case has been substantially delayed as a result. Nonetheless, the Court finds that striking the Second Amended Complaint would have no practical effect because the Court has dismissed Count Four, the claim that Keaton untimely added (ECF No. 29 at 3-5).

This does not mean, however, that there should be no sanction for Plaintiff's repeated failures—even after multiple warnings—to follow court orders, as set forth on pages 3 to 6 and 9 to 12 of Defendant's brief. (ECF No. 54-1.) Because the Court is loath to punish the Plaintiff for the apparent repeated errors of her lawyer, however, the Court finds that it should consider imposing some sanction against Plaintiff's counsel.

Therefore, **within fourteen days of this order,** Defendant shall file a statement estimating the extra time defense counsel was required to spend responding to the Second Amended Complaint and shall indicate the hourly rate the State assigns to her time for purposes of fee applications. **Within seven days of such filing**, Plaintiff's counsel shall file a statement showing cause why the Court should not require him to pay the State the expenses set forth in defense counsel's statement, or at least a reasonable portion thereof. **Failure by Plaintiff's counsel to respond timely to the Defendant's filing in response to this order will result in the Court's imposing a monetary sanction of $250.00 on Plaintiff's counsel in addition to any fee award.**

IV.    **Conclusion**

For the reasons stated above, the motion to dismiss is GRANTED in part and DENIED in part. The case will proceed with respect to Keaton's failure-to-promote and retaliation claims

(Counts One and Two). Counts Three and Four, as well as Keaton's claim for punitive damages, are DISMISSED.

As discovery was stayed pending the Court's ruling on the motion to dismiss, **within fourteen days of this order**, the parties shall confer and file a proposed revised schedule for this case in accordance with Local Rule 26(f).

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            March 9, 2018